NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| VASSOS MARANGOS | : |  |
|  | : | Civ. No. 05-4919 (GEB) |
| Plaintiff, | : |  |
|  | : | **MEMORANDUM OPINION** |
| v. | : |  |
|  | : |  |
| FLARION TECHNOLOGIES, INC. | : |  |
|  | : |  |
| Defendant. | : |  |
|  | : |  |

**BROWN, Chief Judge**

This matter comes before the Court upon the motion of defendant Flarion Technologies, Inc. ("Defendant") for summary judgment of the Complaint of plaintiff Vassos Marangos ("Plaintiff"). The Court has read and considered all documents filed and submitted and has decided the motion based upon the parties' submissions and without oral argument, pursuant to Federal Rule of Civil Procedure 78. For the reasons set forth below, Defendant's motion for summary judgment is granted.

## I.    BACKGROUND[1]

Plaintiff is 48 years old and a naturalized United States citizen whose ethnic background is Greek. Def.'s SOF, ¶ 1. Plaintiff is an engineer whose background includes management experience as well as wireless systems design and implementation. Pl.'s SOF, ¶ 100. Defendant is a wireless data communications company that was formed in February 2000 as a spin-off of Lucent

---

[1] The Court notes Defendant's concerns regarding the inconsistences contained in Plaintiff's Statement of Facts and Plaintiff's Objections to Defendant's Statement of Facts. Pl.'s Reply Br. at 3-9.

Technologies.  Cert. of R. Dolan, ¶ 2.  Prior to declining an offer of employment from Defendant in

2000 and accepting employment at IBM, Plaintiff was a manager for Lucent Technologies, Inc.

Def.'s SOF, ¶ 2.  While at Lucent, Plaintiff worked on wireless handsets.  Id. at ¶ 3.  Plaintiff left

Lucent in November 2000 and joined IBM until July/August 2002.  Id. at ¶ 4.  Plaintiff rejoined

Defendant in September 2002 and remained there until January 2003.  Id. at ¶ 5.  During Plaintiff's

first period of employment with Defendant, Victor Abramsky was the manager of Defendant's RF

Engineering Department.  Id. at ¶ 6.  As of September 30, 2002, the RF Engineering Department was

comprised of Victor Abramsky (RF department manager, systems engineer; born in Ukraine; speaks

English, Ukrainian, Russian); Per Kristensen (engineer; born in Denmark; speaks English, Danish,

some German); Michael Magarowicz (technician; born in the United States; speaks English);

Plaintiff (engineer; born in Cyprus; speaks English, Greek); Anton Radionov (engineer; born in

Bulgaria; speaks English, Bulgarian, Russian); Peter Suprunov (engineer; born in Moldova; speaks

English, Russian, Moldovan); Zenon Tofil (engineer; born in Poland; speaks English, Polish); Isaac

Vengerik (technician; born in Latvia, immigrated to Israel in 1960's and to the United States in

1970's; speaks English, Hebrew, Russian, Latvian) and Mark Tylevich (engineer; born in Russia;

speaks English, Russian).  Id. at ¶ 8.  During Plaintiff's first period of employment with Defendant,

the RF Engineering group worked on two types of mobile technology: mobile devices (*i.e.* cellular

phones, PC cards and desktop modems) and base stations.  Id. at ¶ 9.  Plaintiff worked on mobile

devices and did not request to work on base stations during his first period of employment with

Defendant.  Id. at ¶ 10-11.

On January 30, 2003, Plaintiff resigned from Defendant by submitting a letter of resignation

which cited "family related" reasons for his departure.  Id. at ¶ 12.  Plaintiff did not assert any legal

claims against Defendant stemming from his first period of employment until August 22, 2005 when he filed the present Complaint.  Id. at ¶ 17.  Plaintiff joined Mobicom Corp. in New Jersey after leaving Defendant in January 2003, and remained there for approximately one year until March 2004.  Id. at ¶ 18.  On December 29, 2003, Plaintiff was in contact with Defendant regarding  a position with the company.  Id. at ¶ 19.  Defendant made an offer to Plaintiff to return as an engineer in the RF Engineering Department, and  Plaintiff accepted the offer on February 22, 2004 by signing the employment offer and commenced employment in March 2004.  Id. at ¶¶ 20, 21.  In June 2004, the RF Engineering Department contained many of the same employees as it did in 2002, with a few additional members: Abramsky; Kristensen; Magarowicz; Plaintiff; Radionov; Suprunov; Tofil; Vengerik; Tylevich; David Miller (engineer; born in the United States; speaks English); Roderick Lowe (technician; born in the United States or Jamaica; speaks English); Mrigya Datta (engineer; born in India; speaks English and an Indian language (not specified) ); and Qianru Dong (engineer; born in China; speaks English, Chinese).  Id. at ¶ 23; Pl.'s Objections, ¶ 23.

During this second period of employment, Plaintiff worked on a handset taskforce.  Def.'s SOF, ¶ 26.  Plaintiff stated that "[t]here were absolutely no problems during my one (1) year there [Flarion] and my relationship with everyone, including [Abramsky], was cordial."  Id. at ¶ 27.  Plaintiff also stated that his second period of employment with Defendant was generally acceptable, describing it as "Sugar and Honey until . . . Wed., January 26, 200[5]."  Id. at ¶ 28.  On January 31, 2005, Defendant announced a reduction in its workforce and the handset project Plaintiff was involved with was terminated, however, no RF engineers (including Plaintiff) were affected by the layoffs.  Id. at ¶ 30.  Plaintiff was re-incorporated into the RF Engineering Department.  Id.  In January 2005, Plaintiff was assigned to work on a wireless mobile PC card project, an area in which

3

Plaintiff had previously specialized.  Id. at ¶ 32.  Plaintiff claims that in December 2004, Plaintiff asked Mr. Abramsky for a promotion to manage the Base Station group within the RF Engineering Department and in January 2005 Plaintiff requested a team leader position.  Pl.'s SOF, ¶¶ 136, 137.

In January 2005, Plaintiff sent an anonymous email to Defendant executives stating, "Bob Suffern [an executive with Defendant] was fully aware of the Russian contingent in the RF team. If Russians, who monopolize base-stations decided to leave they could take down Flarion . . . This is elementary management 101, you never allow things like that to take root."  Id. at 138.  In January 2005, Plaintiff interviewed for a position with another company.  Def.'s SOF, ¶ 33.  On January 28, 2005 at 4:35 p.m. Plaintiff emailed Mr. Abramsky and Per Kristensen stating that he was moving the upcoming Sunday and may need off the following Monday.  Id. at ¶ 34.  Plaintiff ultimately took off the entire week of January 31, 2005, during which time he moved and interviewed with Sequoia Communications in California.  Id. at ¶ 35.  On February 10, 2005 at 8:13 p.m. Plaintiff emailed Mr. Abramsky and Mr. Kristensen and informed them that he would not be in the following day.  Id. at ¶ 36.  According to Defendant, the absences were affecting Plaintiff's job commitments.  Id. at ¶¶ 37, 38.  Plaintiff denies that his work duties were impacted by these absences.  Pl.'s Objections, at ¶¶ 37-38.  Plaintiff claims that on December 27, 2004, he requested approval from Mr. Abramsky to carry over unused vacation days and reminded him of those unused days on January 30, 2005 and February 11, 2005.  Id. at 143.

On February 14, 2005, Plaintiff went to Mr. Abramsky's office regarding the project he was working on.  Def.'s SOF, ¶ 39.  Defendant claims that Plaintiff had a "nasty" exchange with Mr. Abramsky, during which Plaintiff stated that he was "in charge of [the project]" and was "10 times more qualified than [Abramsky] to do the job that [Abramsky was] doing [and] that [Abramsky was]

4

not even qualified to be in that position." Id. at ¶ 39.  After this meeting, Plaintiff met with Krishna

Murti, Defendant's Vice President of Production Realization, where Defendant claims they discussed

how Plaintiff felt the RF Engineering Department should be restructured. Id. at ¶ 40.  Defendant and

Plaintiff dispute whether the conversation with Mr. Murti involved allegations of discrimination.

Id. at ¶¶ 40, 41; Pl.'s Objections, at ¶ 40, 41.  Mr. Murti asked Plaintiff to focus on his job rather than

the overall corporate makeup at Defendant Flarion.  Def.'s SOF, ¶ 42.

On February 14, 2005, Plaintiff sent two emails to Mr. Murti and Mr. Abramsky, and met

with Mr. Murti a second time on February 15, 2005.  Id. at ¶¶ 43, 44.  At the time of this meeting,

Mr. Murti had investigated Plaintiff's concerns about the RF Engineering Department and relayed

to Plaintiff his "conclusion from the investigation[, which] did not reveal any major issues with the

RF Group's performance or stability . . . ."  Id. at ¶ 45. Mr. Murti again instructed Plaintiff to focus

on his work.  Id.  Plaintiff indicated that he had "calmed down" and agreed to refocus on his work.

Id. at ¶ 46.  On February 15, 2005, Mr. Abramsky emailed an employee in the Human Resources

Department regarding Plaintiff's absences and  tardiness to meetings, stating that "[m]y opinion at

this time is that we can allocate resources in such a way as to meet the deliverables without Vassos."

Pl.'s SOF, ¶ 145 (FLA 00150).  On February 16, 2005, Plaintiff sent Mr. Abramsky and Mr.

Kristensen an email stating "I am really sorry for what happened."  Def.'s SOF,  ¶ 49 (Wissert Cert.,

¶ 14, Exh. M).

On February 17, 2005, Plaintiff attended a status meeting held by Mr. Abramsky, during

which, Defendant claims, Plaintiff became defensive.  Id. at ¶¶ 50, 51.  After this incident, Plaintiff

met with Mr. Murti who indicated that he would be sending Plaintiff an email, however, Plaintiff

did not receive the email as he submitted his resignation the evening of February 17, 2005.  Id. at ¶

52.  Plaintiff claims that he received an offer from Sequoia on February 21 or 22, 2005, however, Defendant contends that Plaintiff received the offer on February 17, 2005.  Id. at ¶¶ 54, 55; Pl.'s Objections, ¶ 55. Plaintiff's last day on Defendant's payroll was either March 8 or 9, 2005.  Id. at ¶ 59; Pl.'s Objections, ¶ 59.

Plaintiff was not employed with Defendant for one full year.  Def.'s SOF, ¶ 62.  Defendant claims that Plaintiff did not have a performance evaluation because he was not employed there for a full year.  Id. at ¶ 63.  Plaintiff claims he has never received a negative written evaluation from Defendant.  Pl.'s SOF, ¶ 102.  Defendant claims that among the department members who speak Russian (5 out of 13 during Plaintiff's second period of employment), it was only on occasion that they held conversations amongst themselves in Russian.  Def.'s SOF, ¶ 70.  Plaintiff acknowledges that the "Russians" spoke English when they interacted with "non-Russians."  Id. at ¶ 71.  Plaintiff resigned for the first time in 2003, noting on his exit interview form that he "[f]elt that there was a wall between Russians and non Russians.  Occasionally Victor [Abramsky] spoke in Russian at meetings."  Id. at ¶ 108.

In September 2000, Mr. Abramsky instituted non-mandatory Thursday gatherings at Defendant Flarion which were held after hours.  Def.'s SOF, ¶¶ 72, 73.  During these gatherings, Mr. Abramsky or the employee hosts provided non-alcoholic and alcoholic beverages and snacks.  Id. at ¶¶ 74, 75, 76, 77, 78; Pl.'s SOF, ¶ 124.

Plaintiff was divorced from his wife in 2004, and Defendant was ordered to withhold child support payments from Plaintiff's pay beginning in October 2004.  Def.'s SOF, ¶ 81.  An error occurred and the wrong amount was withheld on two occasions, in October 2004 and February 2005.  Id. at ¶¶ 82, 83, 84.

6

## II.   DISCUSSION

### A.   Standard Summary Judgment

A party seeking summary judgment must "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Orson, Inc. v. Miramax Film Corp., 79 F.3d 1358, 1366 (3d Cir. 1996); Healy v. New York Life Ins. Co., 860 F.2d 1209, 1219, n.3 (3d Cir. 1988), cert. denied, 490 U.S. 1098 (1989); Hersh v. Allen Prods. Co., 789 F.2d 230, 232 (3d Cir. 1986).  The threshold inquiry is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986)(noting that no issue for trial exists unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict in its favor).  In deciding whether triable issues of fact exist, the Court must view the underlying facts and draw all reasonable inferences in favor of the non-moving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995); Hancock Indus. v. Schaeffer, 811 F.2d 225, 231 (3d Cir. 1987).

Rule 56(e) of the Federal Rules of Civil Procedure provides, in relevant part:

> When a motion for summary judgment is made and supported as
> provided in this rule, an adverse party may not rest upon the mere
> allegations or denials of the adverse party's pleading, but the adverse
> party's response, by affidavits or as otherwise provided in this rule,
> must set forth specific facts showing that there is a genuine issue for
> trial.  If the adverse party does not so respond, summary judgment, if
> appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 56(e).  The rule does not increase or decrease a party's ultimate burden of proof on

a claim. Rather, "the determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case." <u>Anderson</u>, 477 U.S. at 255.

Under the Rule, a movant must be awarded summary judgment on all properly supported issues identified in its motion, except those for which the nonmoving party has provided evidence to show that a question of material fact remains. <u>See Celotex</u>, 477 U.S. at 324. Put another way, once the moving party has properly supported its showing of no triable issue of fact and of an entitlement to judgment as a matter of law, for example, with affidavits, which may be "supplemented . . . by depositions, answers to interrogatories, or further affidavits," <u>id.</u> at 322 n.3, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita</u>, 475 U.S. at 586 (citations omitted); <u>see also Anderson</u>, 477 U.S. at 247-48 (stating that "[b]y its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.").

What the nonmoving party must do is "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" <u>Celotex</u>, 477 U.S. at 324; <u>see also</u> <u>Lujan v. Nat'l Wildlife Fed'n</u>, 497 U.S. 871, 888 (1990)(stating that "[t]he object of [Rule 56(e)] is not to replace conclusory allegations of the complaint . . . with conclusory allegations of an affidavit."); <u>Anderson</u>, 477 U.S. at 249; <u>Big Apple BMW, Inc. v. BMW of N. Am., Inc.</u>, 974 F.2d 1358, 1363 (3d Cir. 1992), <u>cert. denied</u>, 507 U.S. 912 (1993)(stating that "[t]o raise a genuine issue of material  fact, . . . the opponent need not match, item for item, each piece of evidence proffered by the movant," but

8

must "exceed[] the 'mere scintilla' threshold and . . . offer[] a genuine issue of material fact.").

The Local Civil Rules supplement the Federal Rules of Civil Procedure and provide that "each side shall furnish a statement which sets forth material facts as to which there exists or does not exist a genuine issue." L. Civ. R. 56.1. "Where possible, a single joint Rule 56.1 statement is favored." Allyn Z. Lite, New Jersey Federal Practice Rules 192 (2006 ed.)(citations omitted). "Where a joint statement is not prepared, then, under the rule, 'facts submitted in the statement of material facts which remain uncontested by the opposing party are deemed admitted.'" Id. at 193 (citations omitted). However, "the parties' statements pursuant to Local Rule 56.1 "cannot bind the Court if other evidence establishes that the stipulated facts are in error." Id. (citation omitted).

### B.     Plaintiff Fails to Satisfy his Burden on his Discrimination Claims

While Plaintiff's opposition brief to this motion for summary judgment includes references to both Title VII and NJLAD, the Complaint itself is devoid of reference to which statute(s) Plaintiff used as the legal basis for his claims. See Pl.'s Complaint. Defendants assume, and Plaintiff confirms in his opposing papers, that he is asserting a claim under the New Jersey Law Against Discrimination, N.J. Stat. Ann. § 10:5-1 to -49 ("NJLAD"). However, Plaintiff also cites to Title VII. Defendants argue that Plaintiff cannot assert a claim under Title VII because Plaintiff did not file a charge with the Equal Employment Opportunity Commission ("EEOC"), and the time for him to do so has long since expired. Shepherd v. Hunterdon Developmental Ctr., 174 N.J. 1, 19 (2002) (citing Nat'l Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 104-105 (2002)) ("Under Title VII . . . a plaintiff 'shall' file an employment discrimination charge with the [EEOC] either 180 or 300 days after an 'alleged unlawful employment practice occurred.'"); 42 U.S.C. § 2000e-5(e)(1). Accordingly, Plaintiff's discrimination claims and hostile work environment claims shall be assessed

pursuant to NJLAD.

The Third Circuit has recognized that the New Jersey Supreme Court, "[i]n the absence of divergent language between the NJLAD and federal discrimination laws, . . . has applied federal standards in NJLAD cases 'in the interest of achieving a degree of uniformity in the discrimination laws.'" Monaco v. Am. Gen. Assurance Co., 359 F.3d 296, 305 (3d Cir.) (citations omitted), cert. denied, 543 U.S. 814 (2004). Consequently, the Court will apply the McDonnell Douglas burden shifting analysis to Plaintiff's claims. See Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003)(citations omitted), cert. denied sub nom. Sarullo v. Potter, 541 U.S. 1064 (2004).

Plaintiff must first prove a *prima facie* case of discrimination by a preponderance of evidence. See Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981) (quoting McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)). To make a prima facie case here, Plaintiff must prove 1) that he belongs to a protected class; 2) that he was qualified for the position; 3) that despite his qualifications he was terminated; and 4) that under circumstances raising an inference of discrimination, the employer continued to seek out individuals with qualifications similar to Plaintiff's to fill the position. See Sarullo, 352 F.3d at 797 (citing McDonnell Douglas, 411 U.S. at 802 and Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 348 n.1 (3d Cir. 1999)); see also Abramson v. William Patterson College of New Jersey, 260 F.3d 265, 281-82 (3d Cir. 2001).

Once established, Plaintiff's *prima facie* case creates a rebuttable presumption of discriminatory intent. See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993); Burdine, 450 U.S. at 254. While the ultimate burden of proof always remains with Plaintiff, the burden of production now shifts to Defendants, who must articulate a legitimate, nondiscriminatory reason for their actions. See Hicks, 509 U.S. at 507; Burdine, 450 U.S. at 253. To satisfy their burden,

defendants must come forward with admissible evidence supporting the nondiscriminatory reason or reasons for their actions.  See Burdine, 450 U.S. at 255.  "The McDonnell Douglas formula is grounded in the presumption that if a rational reason for disparate treatment is not forthcoming, it is more likely than not that illegal discrimination played a role in the [adverse] decision."  Chauhan v. M. Alfieri Co., 897 F.2d 123, 127 (3d Cir. 1990)(citations omitted).  Once defendants satisfy their burden, the presumption of discriminatory intent is rebutted and drops from the case.  See id.

The burden of production then shifts back to plaintiff, who must come forward with admissible evidence showing that the articulated nondiscriminatory reasons were not the true reasons for the adverse action, but merely a "pretext for discrimination."  McDonnell Douglas, 411 U.S. at 804; Hicks, 509 U.S. at 507-08; Burdine, 450 U.S. at 253.  "[A] plaintiff does not need direct evidence of pretext in order to survive summary judgment."  Chauhan, 897 F.2d at 127 (citing Chipollini v. Spencer Gifts, Inc., 814 F.2d 893 (3d Cir.), cert. dismissed, 483 U.S. 1052 (1987)).  "Instead, a plaintiff needs to be able to 'point[] to evidence which calls into question the defendant's intent.'"  Id. (quoting Chipollini, 814 F.2d at 899).  "In sum, the plaintiff cannot rely solely on a potential finding that the defendant's explanation is implausible.  The fact that a judge or a jury might disbelieve the defendant's asserted nondiscriminatory reason is not enough, by itself, to preclude summary judgment.  Rather, the plaintiff must be able to adduce evidence, whether direct or circumstantial, from which a reasonable jury could conclude that the defendant's explanation is incredible."  Id. at 128 (citation omitted).

Plaintiff claims that he received ethnically-based work assignments, was denied promotions and was segregated based on his ethnicity, or more specifically, because of his lack of "Russian" ethnicity.  Pl.'s Br. at 30.  Plaintiff also claims that he was constructively discharged from his

position with the Defendant.  Id.  Plaintiff contends, and Defendant concedes, that he meets the first

and second prongs of the  McDonnell Douglas  test, namely, that he was a member of a protected

class and that he was technically qualified for his position.  Def.'s Br. at 24.

Despite satisfying the first two elements of McDonnell Douglas, Defendant contends that

Plaintiff cannot establish a *prima facie* case of discrimination because there was no adverse

employment action, as required by step three of McDonnell Douglas.  Id. at 25-29.  Plaintiff correctly

cites to the two-year statute of limitations which applies to the NJLAD.  See N.J. Stat. Ann. § 2A:

14-2(a).  Accordingly, Plaintiff cannot assert claims regarding alleged adverse acts which occurred

before August 16, 2003 - two years prior to the filing of the Complaint on August 16, 2005.  See

Pl.'s Complaint.  Plaintiff's first period of employment with Defendant occurred from September

2002 through January 2003.  Accordingly, any incidents regarding alleged discrimination will not

be considered by this Court which occurred during that time period.  However, Plaintiff's second

term of employment with Defendant, from March 2004 through March 2005 may be considered for

the purposes of this motion.

### 1.    *Plaintiff's Adverse Action Claims*

During Plaintiff's second term of employment with Defendant, he claims that Mr. Abramsky

segregated the RF Engineering Department into "Russians vs non-Russians" which "depriv[ed] non-

Russians from the privilege of technical growth or advancement."  Pl.'s Br. at 32.  Plaintiff claims

that the Russians performed Base Station work and the non-Russian employees performed Mobile

Product Work.  Id.  Plaintiff maintains that Mr. Abramsky divided the department in this manner in

order to "monopoliz[e] the Base Station work . . . to prevent anyone form [sic] taking any action

against him, affectively [sic] creating a de facto blackmail situation."  Id. at 33.  Plaintiff states that

Mr. Abramsky also hired "non-Russians" in the Mobile group.  Id. at 34.  Regarding the disparity among job assignments, Plaintiff cites to several affidavits of Defendant employees, who claim that they were discriminated against based upon their ethnicity.  For example, Arthur Zekis' affidavit states that "[E]very day I listed to conversations in Russian language.  This divided the department and kept the non-Russians [sic] members of the group in the dark, especially regarding Base Station work."  Pl.'s Br. at 35 (citing Exh. M).  Another employee, Zenon Tofil stated that "I was never given the assignments that would reflect my abilities.  That was by design, because Victor [Mr. Abramsky] had an agenda to keep non Russian speaking employees not visible in the organization."  Pl.'s Br. at 35 (citing Exh. O).  Plaintiff also alleges that he suffered adverse action when he was denied a promotion in December 2004.  Pl.'s Br. at 36.  Plaintiff claims that he asked for the promotion on two occasions and was denied by Mr. Abramsky.  Id. at 36-37.  Plaintiff claims that Peter Suprunov, a "Russian," received the promotion after Plaintiff left Defendant Flarion.  Additionally, Plaintiff alleges that he was discriminated against by way of compensation, claiming that he and other "non-Russians" were under-compensated in relation to the "Russians."  Id. at 39.

       In order to establish an "adverse employment action," the plaintiff must put forth an action by an employer that is "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment."  Storey v. Burns Int'l Security Servs., 390 F.3d 760, 764 (3d Cir. 2004) (quoting Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001)); see also N.J. Stat. Ann. § 10:5-12(a) ("to refuse to hire or employ or to bar or to discharge or require to retire . . . or to discriminate against . . . in compensation or in terms, conditions, or privileges of employment.").  Plaintiff claims that disparity in job assignments, denial of a promotion and differences in compensation were all adverse actions.  Viewing the facts in a light more favorable to Plaintiff, these

acts could be considered adverse employment actions.  However, even if Plaintiff presents a *prima facie* case of discrimination, Defendant has set forth legitimate, non-discriminatory reasons for the aforementioned actions.  Defendant states that Plaintiff did not receive an employee performance review, during which employees had the opportunity to gain advancement, because he resigned prior to his one year anniversary with Defendant.  Defendant also states that Plaintiff was assigned to work on the same handset technology he worked on at his previous job at Mobicom.  Further, Defendant claims that Plaintiff's compensation was based upon his experience, individual merit, job qualifications/performance and length of time with Defendant, and was consistent with the salaries of other engineers.  Pl.'s Br. at 29.  Moreover, when Plaintiff left Defendant and joined Sequoia, he received a higher salary, but assumed a position that was equivalent to a vice-president position at Defendant Flarion.  Id.

The burden now shifts to Plaintiff to show that these reasons were merely pretext for discrimination.  While Plaintiff need not set forth direct evidence of pretext to survive summary judgment, he must nonetheless point to specific evidence which calls into question Defendant's intent.  Plaintiff's claims of ethnic discrimination based on disparity in job assignments, denial of a promotion and differences in compensation fail here.  Plaintiff has not presented evidence demonstrating that Defendant's stated reason for the conduct was merely pretext for discrimination.  In this case, Plaintiff cites to affidavits which contain assumptions by Defendant's employees regarding what they perceived to be a problem with the RF Engineering Department.  These affidavits are devoid of factual assertions that would support Plaintiff's claims of discrimination.  Plaintiff does not cite to specific evidence to support his claims, rather, he makes broad allegations regarding a purported "Russian protectorate" which are not supported by documents, affidavits or

14

other evidence.    Plaintiff makes generalizations regarding the different manner in which his supervisor, Mr. Abramsky, treated "non-Russian" employees, however, does not cite to any specific examples or conversations that would question the legitimacy of Defendant's reason for the alleged adverse actions.

### 2.    *Plaintiff's Constructive Discharge Claim*

Plaintiff also claims that he suffered  adverse action by way of retaliation and imminent termination.  Id. at 37.  Plaintiff contends that he sent an anonymous memorandum to the upper management of Defendant reminding them of the "Russian problem."  Id.  After his complaints, Plaintiff claims he feared termination.  Plaintiff cites to Mr. Abramsky's email which he claims indicates Defendant's plan to terminate him.  The email states "[m]y opinion at this time is that we can allocate resources in such a way as to meet the deliverables without Vassos."  Id. a 38 (quoting Exh. RR).  Plaintiff also cites to several incidents which he claims demonstrate that Defendant was about to terminate him, namely, a meeting in which Mr. Abramsky spoke with Plaintiff regarding being late with his work product.  Id.  Plaintiff claims that this conduct, in addition to retaliation for sending emails to executives and complaining about Mr. Abramsky, constitutes constructive discharge.  To establish constructive discharge, Plaintiff must show that Defendant "knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign."  Goss v. Exxon Office Sys. Co., 747 F.2d 885, 888 (3d Cir. 1984). "Intolerability . . . is assessed by the objective standard of whether a 'reasonable person' in the employee's position would have felt compelled to resign - that is, whether [he] would have had no choice but to resign."  Conners v. Chrysler Financial Corp., 160 F.3d 971, 976 (3d Cir. 1998).

In Shepard v. Hunterdon Dev. Ctr., 174 N.J. 1 (2002), the Court found that "an employee has

the obligation to do what is necessary and reasonable in order to remain employed rather than simply quit." 174 N.J. at 28.  The Court must consider "the nature of the harassment, the closeness of the working relationship between the harasser and the victim, whether the employee resorted to internal grievance procedures, the responsiveness of the employer to the employee's complaints, and all other relevant circumstances."  Id.  A constructive discharge claim calls for "a sense of outrageous, coercive and unconscionable requirements" and "requires more egregious conduct than that sufficient for a hostile work environment claim."  Id.  Defendant claims that Plaintiff decided to resign from Defendant Flarion voluntarily and was not harassed.  Defendant also contends that Plaintiff had little to no communication with Mr. Abramsky, who Plaintiff alleges forced him to resign.  Defendant also notes that Plaintiff did not seek internal remedies to his issues with Mr. Abramsky until February 14, 2007 - three days prior to submitting his resignation via email. Defendant claims that once Plaintiff approached Mr. Murti with his concerns, Mr. Murti conducted an investigation on Plaintiff's behalf and spoke with Plaintiff on more than one occasion to assist with the problems he was having with Mr. Abramsky.

The Third Circuit has voiced its concern regarding the public policy implications of constructive discharge claims.  Specifically, the Court has noted that:

> [T]he law does not permit an employee's subjective perceptions to govern a claim of constructive discharge . . . An employee is protected from a calculated effort to pressure him into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by [his] coworkers. [He] is not, however, guaranteed a working environment free of stress . . . . [The employment discrimination laws] cannot be transformed into a palliative for every workplace grievance, real or imagined, by the simple expedient of quitting.

Gray v. York Newspapers, Inc., 957 F.2d 1070, 1083 (3d Cir. 1992).  Here, Plaintiff has failed to set

forth conditions that would be considered "intolerable." Plaintiff claims that his problems with Mr. Abramsky were not handled sufficiently, as Mr. Murti did not find any significant issues with relation to the RF Engineering Department. Plaintiff claims that he feared that he would be terminated based on his complaints to upper management, including an email attaching a memorandum detailing "Victims' Stories" regarding alleged discrimination and/or problems suffered by other Flarion employees. Plaintiff contends that no human resources representative got involved with his complaints until his last day at Defendant Flarion when he returned company property.

Plaintiff has failed to set forth sufficient evidence to establish a constructive discharge claim. There is no support in the record to substantiate Plaintiff's concerns that he was about to be fired from Defendant as a form of retaliation by Mr. Abramsky or others, or based on his ethnicity. Plaintiff had interviewed with another company in January 2005, long before he voiced his complaints to his supervisors. Plaintiff resigned on February 17, 2005 prior to a completion of any investigation of his concerns by Defendant. There is no evidence that the work environment was "intolerable" or forced Plaintiff to resign. Accordingly, Plaintiff's constructive discharge claim fails.

In order to survive a motion for summary judgment, Plaintiff must go beyond mere allegations and point to specific instances and evidence which support his claims. The Court concludes that there are no genuine issues of material fact regarding Plaintiff's NJLAD discrimination or constructive discharge claims and that the evidence demonstrates that Defendant did not constructively terminate Plaintiff. Fear of being fired is not, in and of itself, enough to establish claims of discrimination and/or constructive discharge. Consequently, Defendants' motion for summary judgment is granted with respect to Plaintiff's claims under NJLAD.

17

**C.**     **Plaintiff Fails to Satisfy his Burden on his Hostile Work Environment Claim**

NJLAD requires that employees shall work in an environment which is relatively free from discriminatory intimidation, ridicule and insult.  Lehmann v. Toys 'R' Us, Inc., 132 N.J. 587 (1993). In order to make a cognizable hostile work environment claim under NJLAD, a plaintiff must prove that the harassing conduct about which he complains: (1) would not have occurred but for his ethnicity; and that it was (2) severe or pervasive enough to make a (3) reasonable person with  the victim's protected characteristic believe that (4) the conditions of his employment have been altered and his work environment has become hostile or abusive.  Taylor v. Metzger, 152 N.J. 490, 498 (N.J. 1998)(citing Lehman, 132 N.J. at 603-604).  "We emphasize that it is the harassing conduct that must be severe or pervasive, not its effect on the plaintiff or on the work environment."  Lehman, 132 N.J. at 606 (quoting Ellison v. Brady, 924 F.2d 872, 878 (9th Cir. 1991)).  Additionally, "courts must consider the cumulative effect of the various incidents, bearing in mind 'that each successive episode has its predecessors, that the impact of the separate incidents may accumulate, and that the work environment created may exceed the sum of the individual episodes.'"  Lehman, 132 N.J. at 607 (citing Burns v. McGregor Elec. Indus., 955 F.2d 559, 564 (8th Cir. 1992)).

In this case, Plaintiff has failed to set forth evidence of harassing conduct that was based upon his ethnicity.  After Plaintiff's first resignation from Defendant in 2005, he stated, in his exit interview paperwork, that "[t]here were absolutely no problems during my one (1) year there and my relationship with everyone, including [Mr. Abramsky], was cordial."  Wissert Cert., Exh. H, p.12. Now, Plaintiff contends that this was not the case, and that he was subject to a hostile work

environment during both his first and second periods of employment with Defendant.[2]  Plaintiff claims that the use of the Russian language to communicate among employees was harassing, constituting pervasive and abusive behavior.  Pl.'s Br. at 46.  Plaintiff claims that "[s]peaking in Russian included mocking and ridiculing of non-Russians."  Id.  Defendant, however, contends that only a percentage of the employees spoke Russian, and pursuant to the EEOC guidelines, Defendant is not permitted to prohibit casual conversations between employees in their native or preferred tongues.    EEOC   Compliance   Manual,   Section   13:   National   Origin   Discrimination, http://www.eeoc.gov/policy/docs/national-origin.html#VC.  Plaintiff also points to affidavits in support of his hostile environment claim, however, these affidavits include improper conclusions, as the former employees state that they "felt" or "believed" they were discriminated against "because of the hostile environment."  Pl.'s Br. at 47 (citing Exh. O and I).

Plaintiff also claims that the hostile environment included retaliation and termination to those who complained to upper management.  Id. at 48.  Moreover, Plaintiff contends that the weekly department gatherings, which sometimes included alcoholic beverages, forced employees to engage in drinking alcohol or providing alcohol for others.  Id.  Defendant maintains that these weekly gatherings were voluntary, and the employees were not required to supply or drink alcoholic beverages.  Def.'s Br. at 41.  Defendant also submits that at no time was Plaintiff coerced into participating, and the alleged conduct was not based on Plaintiff's ethnicity.  Id.  Plaintiff also claims that the hostile environment was bolstered by a lack of an interview and hiring process, a job

---

[2] The Court notes Defendant's concerns regarding the statute of limitations due to Plaintiff's break in employment between his first and second employment periods with the company. While the statute of limitations for a hostile work environment claim differs from other NJLAD discrimination claims, the issue is moot here as Plaintiff has not set forth the requisite conduct to satisfy a hostile work environment claim during either employment period.

evaluation process, an employee handbook and vacation guidelines.  Pl.'s Br. at 49-50.  Further,

Plaintiff asserts claims of defamation and slander[3] which he contends occurred during department

meetings.  Id.

Despite Plaintiff's list of grievances, he has not set forth sufficient proof in the record to

substantiate these allegations.  Moreover, even if these allegations were supported by evidence, they

do not, even collectively viewed more favorably to Plaintiff, constitute severe or pervasive conduct

based on Plaintiff's ethnicity.   Consequently, summary judgment is granted as to Plaintiff's hostile

work environment claims.

### D.      **Conspiracy, Extortion, Gross Negligence and Breach of Contract**

In the Complaint, Plaintiff alleges that: "[t]he defendant is guilty of willfully and knowingly

allowing its managers to engage in deception, conspiracy and premeditated actions to commit

extortion or is guilty of surrendering and submitting to blackmail and extortions effectively giving

a free hand to its managers to create and reign in fiefdoms of corruption and conspiracy that violated

the State and Federal laws in the process."  Complaint, ¶ 10(J).  Plaintiff claims that Defendant

engaged in a conspiracy to maintain "Russian" employees in the RF Engineering Department and

force "non-Russian" employees to resign or be terminated. Pl.'s Br. at 52.  Plaintiff also claims there

is a second conspiracy among Defendant and his subsequent employer, Sequoia, as he was laid off

from Sequoia "one week after his deposition [in this matter] in New Jersey on precisely the same

---

[3] Plaintiff appears to allege a cause of action for defamation and slander in his Complaint, however, in Plaintiff's opposing brief, he addresses these claims as pertaining only to his hostile work environment claim.  Accordingly, the Court will consider these allegations as part of the hostile work environment claim and not as an independent cause of action.  Plaintiff's brief only addresses these claims by stating that the evidence is hearsay and that the evidence can only become apparent during testimony.  Pl.'s Br. at 50.

date as his termination at defendant company Flarion (March 8 of years 2005 and 2006)." Id. at 53.

"A civil conspiracy is a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means a principal element of which is to inflict a wrong against or injury upon another, together with an act that results in damage." Weil v. Express Container Corp., 360 N.J. Super. 599, 614 (App. Div. 2003)(citing Morgan v. Union Cty. Bd. Of Chosen Freeholders, 268 N.J. Super 337, 364 (App. Div. 1993)). "While the unlawful agreement need not be expressed, and while the participants need not know all the details of the plan designed to achieve the objective or possess the same motives, they must share the general conspiratorial objective." Id. (citing Morgan, 268 N.J. Super. at 365). In order for Plaintiff to establish a conspiracy, he must demonstrate that "there was one plan and that its essential scope and nature was known to each person who is charged with responsibility for its consequences." Id.

Plaintiff has failed to identify any act or behavior that supports the conclusion that Defendant engaged in a conspiracy to eliminate the "non-Russian" engineers or to submit to the demands of Mr. Abramsky in exchange for additional compensation. Plaintiff has not pointed to evidence in the record to support his theory that Defendant agreed to engage in an unlawful act or a lawful act by unlawful means. Moreover, Defendant's second conspiracy involving Defendant and his subsequent employer, Sequoia is completely unsupported and was not set forth in Plaintiff's Complaint. Accordingly, summary judgment is granted with respect to Plaintiff's conspiracy claims.

As to Plaintiff's extortion claim, Defendant contends that there is no civil action for extortion in New Jersey, rather, it is a criminal offense. Dello Russo v. Nagel, 358 N.J. Super. 254, 267 (App. Div. 2003). Accordingly, summary judgment is granted with respect to Plaintiff's extortion claim.

Plaintiff's gross negligence claim pertains to Defendant's "lack of action for the ethnic

discrimination and hostile environment claims" as well as "errors in child support deductions." Pl.'s Br. at 55.  Plaintiff's gross negligence claim is moot as the Court has granted summary judgment with respect to his discrimination claims.  Plaintiff's gross negligence claim regarding Defendant's errors in garnishing his wages also fails.  Gross negligence is "an extreme departure from the ordinary standard of care." Swisscraft Novelty Co. v. Alad Realty Corp., 113 N.J. Super. 416, 426 (App. Div. 1971).  Plaintiff has not set forth evidence to support his claim that the errors in child support payments were anything other than clerical or computer mistakes which resulted in an extreme departure from the ordinary standard of care.  Defendants submit that the mistakes were corrected, and that the New Jersey Family Support Center returned the funds to Plaintiff.  Pl.'s Br. at 49.  Even viewing these facts in a light more favorable to Plaintiff, he has not set forth evidence to support a claim for gross negligence, and summary judgment is granted with respect to this claim.

Additionally, Plaintiff sets forth a claim with regard to "violations of oral agreements in regards to promises of stock options and strike prices thereof upon plaintiff's return to [Flarion] after leaving the first time."  Plaintiff does not offer any argument in favor of this claim in his opposition brief.  Defendant submits that Plaintiff signed a written offer letter, which set forth his option grant and indicated that the letter superceded any other promises to the contrary that may have been made.  Def.'s Br. at 49 (citing Dolan Cert., Exh. G).  Defendant further submits that no such promises were made.  Based on the lack of evidentiary support for this breach of contract claim, summary judgment is granted.

### E.   Witness Tampering and Discovery Violations

Plaintiff claims that Defendant and Defendant's counsel engaged in witness tampering and asks that sanctions be imposed.  Pl.'s Br. at 26.  Plaintiff cites to N.J. Stat. Ann. § 2C:28-5(a) and

18 U.S.C. § 1512 as the legal basis for his claim that Defendant attempted to offer one of Plaintiff's witnesses a position with the company.  This witness, Zenon Tofil, was a former employee of Defendant, and  Plaintiff claims that by rehiring Mr. Tofil, he would have provided ethnic diversity in the RF Engineering Department (Plaintiff claims Mr. Tofil is a "non-Russian") and Mr. Tofil would have been eliminated from the witness list. Pl.'s Br. at 57.  The statutes cited by Plaintiff are criminal statutes and thus the claims based on witness tampering contained in Plaintiff's opposition to Defendant's motion for summary judgment are moot.  Moreover, Plaintiff alleges discovery violations by Defendant based on Fed. R. Civ. P. 26(b)(4).  Magistrate Judge Bongiovanni entered an order on June 28, 2006, that all remaining discovery issues be brought to the Court's attention by July 30, 2006.  Accordingly, this Court will not entertain Plaintiff's untimely and unsupported allegations pertaining to discovery as part of this motion.

## III. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is granted.  An appropriate form of order accompanies this Memorandum Opinion.


Dated: May 1, 2007


   s/ Garrett E. Brown, Jr.
GARRETT E. BROWN, JR., U.S.D.J.

23